# In the United States Court of Federal Claims

No. 23-1740
(Filed:  6 May 2024)

```
*****************************************
LEEBCOR SERVICES, LLC,                  *
                                        *
                Plaintiff,              *
                                        *
v.                                      *   No. 23-1740
                                        *
THE UNITED STATES OF AMERICA,           *
                                        *
                Defendant.              *
                                        *
*****************************************
```

*Patrick K. Burns*, with whom was *Jeremy D. Camacho*, Gordon Rees Scully Mansukhani, LLP, both of Alexandria, Virginia, for plaintiff.

*Joshua A. Mandlebaum*, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiff Leebcor Services, LLC ("Leebcor") is a veteran-owned Virginia-based business. The United States Army Corps of Engineers (USACE) awarded plaintiff a contract to design and build a special tactics team building at Fort Liberty, North Carolina.  On 16 February 2023, plaintiff sued USACE in the United States District Court for the Eastern District of North Carolina seeking equitable and injunctive relief under the Administrative Procedure Act (APA) due to the government's alleged violation of the Antideficiency Act, 31 U.S.C. § 1341.  *See* Compl., ECF No. 1, *Leebcor Services, LLC v. United States Army Corps of Eng'rs et al.*, No. 5:23-70, (E.D. N.C. Feb. 16, 2023).  Before the district court could reach the merits of plaintiff's complaint, however, the government filed a motion to dismiss alleging "only the . . . United States Court of Federal Claims" has jurisdiction over plaintiff's claims.  Gov't's Mot. to Dismiss at 1, ECF No. 19, *Leebcor Services*, No. 5:23-70, (E.D. N.C. May 1, 2023).  Although acknowledging plaintiff "contend[ed] that its claims for declaratory and injunctive relief d[id] not sound in contract," the district court dismissed for lack of subject matter jurisdiction. Dismissal Order at 5, ECF No. 27, *Leebcor Services*, No. 5:23-70, (E.D. N.C. Aug. 1, 2023).  Six days later, on 7 August 2023, plaintiff appealed in the Fourth Circuit, arguing the district court had jurisdiction to grant the injunctive relief plaintiff believed it was entitled to.  *See* Emergency Mot. For Inj. Pending Appeal and Req. For Expedited Br. Schedule, *Leebcor Services, LLC v. United States Army Corps of Eng'rs et al.*, No. 23-1814 (4th Cir. Aug 7, 2023).

Upon denial of its requested relief in the Fourth Circuit, plaintiff filed suit in this court on 5 October 2023, alleging USACE breached the parties' contract by requiring plaintiff to include heightened force protection measures. *See* Compl. As in the district court, the government filed a motion to dismiss arguing the Court lacks subject matter jurisdiction. *See* Gov't's Mot. to Dismiss (MTD), ECF No. 5. In its Motion to Dismiss, the government cites 28 U.S.C. § 1500, which divests this court of jurisdiction over "any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States." *Id.* at 3. The government argues the Court must dismiss plaintiff's Complaint because plaintiff had a related case pending in the Fourth Circuit at the time plaintiff filed in this court. *Id.*

The Supreme Court has explained, "§ 1500 was first enacted to curb duplicate lawsuits." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 311 (2011). More than 150 years of § 1500 jurisprudence have, however, created a "roundly criticized . . . [jurisdictional] trap for the unwary," whereby parties who have otherwise satisfied the jurisdictional requirements of this court may nonetheless see their claims dismissed. *Def. Distrib. & Second Amend. Found. v. United States*, No. 23-849, 2024 WL 1092509, at *2 (Fed. Cl. Mar. 13, 2024) (Bruggink, J.). Indeed, the parties in this case have cited relevant caselaw that is, at least facially, contradictory. *Compare Acetris Health, LLC v. United States*, 949 F.3d 719, 728–30 (Fed. Cir. 2020) (holding Section 1500 does not apply where the tribunal of first filing lacked jurisdiction*), and Tindall v. United States*, No. 2023-1139, 2023 WL 2881312, at *3 (Fed. Cir. Apr. 11, 2023) (reiterating the rule set forth in *Acetris*)*, with Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1383 (Fed. Cir. 2017) (stating in *dicta* the lack of jurisdiction of the tribunal of first filing is irrelevant to a Section 1500 analysis). Further, as noted by the government at oral argument, judicial interpretation of the provision has created room for gamesmanship unrelated to stopping duplicative and wasteful litigation. *See* 27 Mar. 2024 Oral Arg. Tr. (Tr.) at 35:23–36:15 ("THE COURT: Just by way of example that you just described, you would agree that Leebcor could have properly filed in this Court in the gap in time after the District Court decision but before the notice of appeal? [GOVERNMENT]: Under the *Brandt* case, exactly. That's what the *Brandt* case held, Your Honor. THE COURT: But then filing it after the notice of appeal, when there are two suits pending, that would not be okay? [GOVERNMENT]: Right."), ECF No. 11.

On 27 March 2024, the Court held oral argument regarding whether § 1500 divests the Court of jurisdiction over plaintiff's claims. At oral argument, the government—despite having nearly four months to prepare, including several weeks of preparation following a substantive status conference—presented three new cases not yet shared with plaintiff or the Court. *See* Tr. at 6:17–21 ("THE COURT: Okay. Any reason why you didn't bring those up before this morning as we started oral argument? [GOVERNMENT]: Well, it's a good question. I didn't get these until yesterday."). None of these cases nor the government's insistence the Federal Circuit's binding precedent is incorrect, *see* Tr. at 72:19–73:1 ("THE COURT: So in *Acetris*, then, the Government argues the Fed Circuit got it wrong? [GOVERNMENT]: I think that's right."), however, alter the Court's analysis—§ 1500 does not apply to the present case and there is not any action with the same "operative facts" pending that would divest the Court of jurisdiction. The Court accordingly denies the government's Motion to Dismiss.

## I.    Factual and Procedural History

In 2015, Congress approved a DD Form 1391, a document explaining "the maximum allowable scope for [a] project," to provide funding for a military construction project at Fort Liberty, North Carolina.  Compl. at 8.  On 7 June 2018, pursuant to the congressional appropriation, USACE awarded plaintiff a contract to design and build a "Special Tactics Team" building at Fort Liberty.  Gov't Mot. to Dismiss ("Gov't MTD") at 1, ECF No. 5.  Within two years, plaintiff alleges it had completed approximately 85 percent of the construction scope for the awarded contract.  Compl. at 10.  In September 2020, however, USACE sent a letter to plaintiff stating the building must comply with certain anti-terrorism force protection (ATFP) standards.  *Id.*  Plaintiff argued satisfying the ATFP standards was beyond the scope of the contract and DD Form 1391.  *Id.* at 11.  In response, USACE withheld $1.8 million of plaintiff's invoiced amounts for work already completed.  *Id.* at 12.

On 15 February 2023, plaintiff filed a complaint against USACE in the United States District Court for the Eastern District of North Carolina, Gov't MTD at 2, alleging "USACE[] . . . violate[d] the [Antideficiency Act] by instructing Leebcor to provide an 'Above Minimum Threat' ATFP specialized scope of work without Congressional authorization to expend funds for that work."  Corrected Compl. at 8, ECF No. 6, *Leebcor Services, LLC v. United States Army Corps of Eng'rs et al.*, No. 5:23-70, (E.D. N.C. Feb. 16, 2023).  In response to a motion to dismiss by the government alleging "only the agency board of contract appeals or [] the United States Court of Federal Claims" has jurisdiction over plaintiff's claims, Gov't Mot. to Dismiss at 1, ECF No. 19, *Leebcor Services*, No. 5:23-70, (E.D. N.C. May 1, 2023), the district court dismissed for lack of jurisdiction on 31 July 2023.  Dismissal Order at 5–6, ECF No. 27, *Leebcor Services*, No. 5:23-70, (E.D. N.C. Aug. 1, 2023).  On 7 August 2023, plaintiff filed an emergency motion in the United States Court of Appeals for the Fourth Circuit, but this motion was denied.  *See* Gov't MTD at 2.  In its emergency motion, plaintiff alleged "[i]f Leebcor performs as demanded, it faces the end of its business and criminal liability, while USACE violates federal law without consequence."  Gov't MTD, Ex. 1 at A30, ECF No. 5-1 (Emergency Mot. For Inj. Pending Appeal and Req. For Expedited Br. Schedule, *Leebcor Services, LLC v. United States Army Corps of Eng'rs et al.*, No. 23-1814 (4th Cir. Aug 7, 2023)).  On 5 October 2023, while its Fourth Circuit appeal was pending, plaintiff filed a complaint in this court.  *See* Compl.  On 29 November 2023, plaintiff voluntarily withdrew its Fourth Circuit appeal.  Gov't MTD at 2.  On 4 December 2023, the government filed a motion to dismiss in this court pursuant to 28 U.S.C. § 1500.  *See* Gov't MTD.  On 2 January 2024, plaintiff filed a response to the Motion to Dismiss.  Pl.'s Resp. to Gov't Mot. To Dismiss ("Pl.'s Resp."), ECF No. 6.  On 16 January 2024, the government filed a reply.  Gov't Reply In Supp. Of Mot. To Dismiss ("Gov't Reply"), ECF No. 7.

Apparent from the briefing is the parties' primary disagreement as to whether 28 U.S.C. § 1500 should apply to this case and divest the Court of jurisdiction.  The Court held a status conference with the parties on 28 February 2024 to discuss the Motion to Dismiss and the applicability of § 1500.  *See* 14 Feb. 2024 Order, ECF No. 8.  During the status conference, the parties discussed the Court's previous interpretation of 28 U.S.C. § 1500 in *Nycal Offshore Dev. Corp. v. United States*, 148 Fed. Cl. 1 (2020).  As the parties were unable to come to an agreement during the status conference as to appropriate next steps, the Court held oral argument on 27 March 2024.

## II.      Applicable Law and the Court's *Nycal* Decision

### A.      Applicable Law

"In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)).  "It is well-established that the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence." *Brandt v. United States*, 710 F.3d 1369, 1373 (Fed. Cir. 2013) (citing *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002)).

28 U.S.C. § 1500 states:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500.  "To determine whether § 1500 applies, [and therefore strips this court of jurisdiction,] a court must make two inquiries:  (1) whether there is an earlier-filed 'suit or process' pending in another court, and, if so, (2) whether the claims asserted in the earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of Federal Claims action."  *Brandt*, 710 F.3d at 1374 (citing *Trusted Integration, Inc.*, 659 F.3d at 1163–64).  "If the answer to either of these questions is negative, then the Court of Federal Claims retains jurisdiction."  *Id.*

### B.      The Court's *Nycal* Decision and Previous Construction of 28 U.S.C. § 1500

The Court previously discussed the history and the Supreme Court's interpretation of § 1500 in *Nycal*:  "Congress enacted § 1500 'to curb duplicate lawsuits brought by residents of the Confederacy following the Civil War. . . .  The jurisdictional bar in § 1500 was enacted in part to address the problem that judgments in suits against officers were not preclusive in suits against the United States.'"  *Nycal Offshore Dev. Corp. v. United States*, 148 Fed. Cl. 1, 8 (2020) (quoting *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 311 (2011)).  The Court further recounted the history of § 1500:

> "Congress reenacted [§ 1500] at various times, most recently in 1948."  *Tohono O'Odham Nation*, 563 U.S. at 312. . . .  "In 1948, the revisors of the Judicial Code amended the section to enlarge the class of suits pending elsewhere to include suits against the United States."  Schwartz, 55 Geo. L.J. 579 (1967).  This amendment "barred a suit against the United States whenever there was pending elsewhere a suit on the same claim against either an officer or against the United States itself."  *Id.* at 580.  "After 1948 [§ 1500] became a flat prohibition on the maintenance of

two suits against the United States, whatever the doubts as to the law or other need for such suits, even though the doctrine of res judicata would be available to foreclose relitigation of issues in successive suits against the United States." *Id.* "The most recent change to section 1500 in 1982 merely reflected the establishment of the Claims Court in place of the Court of Claims by substituting the former name for the latter." *UNR Indus., Inc. v. United States*, 962 F.2d 1013, 1019 (Fed. Cir. 1992) (citing Federal Courts Improvement Act of 1982, Pub. L. No. 97–164, 96 Stat. 40).

*Nycal*, 148 Fed. Cl. at 9.[1]

In previously interpreting "process" within the meaning of § 1500 to determine in what circumstances the statute applies, the Court followed the steps "the Supreme Court used to interpret legal texts in *Wisconsin Central* and *Heller* . . . : (1) identify and extract the term requiring interpretation; (2) interpret the extracted term's meaning at the time of passage by reviewing passage-era dictionary definitions; (3) analyze the extracted term's historical definition in relation to the surrounding statutory text to determine if that text alters the term's meaning; and (4) evaluate the term as it fits within the individual statute and broader statutory scheme." *Id.* at 12. The Court first identified the statutory language at issue as "[t]he United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff . . . had pending in any other court any suit or *process* against the United States . . . ." *Id.* (quoting 28 U.S.C. § 1500). Second, the Court looked to "passage-era dictionary definitions" to interpret the term "process" based on its ordinary meaning when § 1500 was passed. *See id.* at 12–13. In a footnote, the Court applied corpus linguistics to verify the accuracy of its statutory construction:

> Applying corpus linguistics to this case, the Court searched the [Corpus of Historical American English (COHA)] for historical usage of "process" within four words of "legal." The search identified 166 results from the years 1820 to 2009. After limiting this search to the years 1820 to 1868 to reflect the period when

---

[1] *Nycal* notes:

> "The underlying reason for § 1500 was the limited application of the rule of res judicata in suits against the Government and against government officers." Schwartz, 55 Geo. L.J. at 578. "Without § 1500, . . . the claimants could retry the issues in a second suit because the judgment in the first suit against the government officer-agent would not be res judicata in the second suit against the United States." *Id.* "The statute was *ad hoc* legislation aimed at a particular group of litigants who were then prosecuting suits." *Id.* A seminal treatise titled *Court of Federal Claims Jurisdiction, Practice, and Procedure* (2016) . . . discusses the statutory history and case law interpreting § 1500 (hereinafter the "Solomson Treatise"). The Solomson Treatise describes "the jurisdictional application of Section 1500 . . . by legal scholars as a vacillation 'between a strict, textual approach to section 1500 and a quixotic search for section 1500's true meaning in the contemporary jurisdictional landscape.'" Solomson Treatise at 21–2 (quoting Payson R. Peabody, Thomas K. Gump, & Michael S. Weinstein, *A Confederate Ghost That Haunts the Federal Courts: The Case for Repeal of 28 U.S.C. § 1500*, 4 Fed. Cir. B.J. 95, 102 (1994)) (discussing how, through statute, the Court of Federal Claims' and district courts' jurisdiction incorporate the principles of res judicata and collateral estoppel).

*Nycal Offshore Dev. Corp. v. United States*, 148 Fed. Cl. 1, 9 (2020).

Congress passed § 1500, the corpus produced 48 results.  After accounting for duplicate sources, the corpus produced 33 results.  Most of these results use "process" to indicate full, formal legal proceedings.  For example, one source from 1855 stated, "in pursuance of the warrant [and] legal process aforesaid, and of said further legal process and order last mentioned, the said Watson Freeman, Marshal . . . had in his custody the person of the said Anthony Burns, in the due and lawful execution of the said warrant and legal process. . . ."  A novel from 1827 read, "[i]nsupportable, however, as the evil of payment was, it was better to incur it spontaneously, than by means of legal process."  Further, a source from 1862 stated, "[t]hrough legal process, a conviction of treason might work a forfeiture of the rebel's goods and chattels."

Only three results appeared to refer to something other than legal proceedings.  For instance, an 1856 source wrote, "I examined the business, and have given it as my opinion that he should stifle the legal process by endeavoring to make a private arrangement with the creditors," which seems to refer to something other than a formal proceeding.  One source used "process" to refer to "due legal process." Other sources used "process" in a colloquial sense, rather than as a legal term. These results are thus easily distinguishable.

Similarly, when the Court searched the COHA for "process" and "law" within four words of each other between 1820 and 1869, the corpus produced 76 results.  Although some of these results refer to *due* process of law—a separate legal term of art—the Court excludes those results from its analysis.  Of the responsive results was an 1845 source which wrote "[w]hen estates are settled by process of law. . . ." Another result from 1841 said, "[f]or we think it will be perceived every slaveholder . . . make[s] himself liable . . . to be prosecuted before our courts of law every time he presumes to whip or punish a slave without a 'process of law.'"  Both results also seem to use "process" in the context of full, formal legal proceedings.

. . .

A search of "process" and "suit" within four words of each other yielded one result from 1855, but the terms were also used outside the legal context.

*Id.* at 13 n.6. [2]  Thus, the Court determined "process" within the meaning of § 1500 means direct engagement of a lawsuit between parties.  *Id.*

---

[2] Other courts have used corpus linguistics to interpret the original meaning of statutory terms.  "Corpus linguistics describes language empirically with reference to books, scripts, magazines, newspapers, and more."  *Caesars Entm't Corp. v. Int'l Union of Operating Eng'rs Local 68 Pension Fund*, 932 F.3d 91, 95 n.1 (3d Cir. 2019) (using corpus linguistics to interpret "previously"); *see also Fulkerson v. Unum Life Ins. Cos. of America*, 36 F.4th 678, 682–83 (6th Cir. 2022) (Readler, J.) (describing corpus linguistics as "a helpful tool in assessing common usage . . . commonly used in the constitutional and statutory interpretive settings"); *United States v. Seefried*, 689 F.Supp.3d 8, 13–14 (D. D.C. 2022) (McFadden, J.) (explaining corpus linguistics enables courts to "assess the customary usage of a phrase by searching relevant databases of naturally occurring language"); *State v. Rasabout*, 356 P.3d 1258, 1275–82 (Utah 2015) (Lee, J., concurring) (explaining corpus linguistics and applying it to confirm the majority's interpretation of statutory term).  "[I]n contrast to dictionaries, corpus linguistics is a method for studying language

Third, the Court determined whether the surrounding statutory text alters the meaning of "process:"

> The closest term to "process" in the statute is "suit." *See* 28 U.S.C. § 1500 ("suit or process"). In the mid-nineteenth century, "suit" meant "[t]he prosecution of some claim, demand, or request." *Suit*, BURRILL'S LAW DICTIONARY (1st ed. 1851). "Suit" at that time was "a term of more comprehensive import than action, though commonly used as synonymous with it." *Id.*; *see also Suit*, BOUVIER'S LAW DICTIONARY (1st ed. 1856) (defining "suit" as "[a]n action"). "Action" meant "[a] formal proceeding (or series of proceedings), in a court of justice, between parties plaintiff and defendant, by which the recovery of some alleged right is claimed by the one, and may be resisted by the other; and by which, also, such claim is enforced, or denied by the court." *Action*, BURRILL'S LAW DICTIONARY (1st ed. 1851); *accord Action*, BOUVIER'S LAW DICTIONARY (1st ed. 1856) ("A civil action is a legal demand of one's right, or it is the form given by the law for the recovery of that which is due."). "Suit" and "process" are joined by the word "or" in the statute. The disjunctive "or" is "used as a function word to indicate an alternative." *Or*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).
>
> . . .
>
> Congress' inclusion of the terms "suit" and "or" was not meant to modify the term "process." To the contrary, Congress meant for each "suit" and "process" to carry distinct meaning within the statute. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise. . . .").

*Nycal*, 148 Fed. Cl. at 14. Thus, the Court found "[i]n § 1500 'suit' refers to a party's prosecution of a claim or interest, and 'process' refers to the course of proceedings in that suit."[3]

---

in use and can thus account for some aspects of context. Unlike dictionaries, corpus linguistics allows for the meaning of words to be investigated in light of other words in which they co-occur." Stefan Th. Gries & Brian G. Slocum, *Ordinary Meaning and Corpus Linguistics*, 2017 B.Y.U. L. Rev. 1417, 1441.

[3] As discussed in *Nycal*:

> When looking at the surrounding text, the historical definition of "process" is different from the modern usage of "suit or process" when used in a legal sense. The modern legal definition of suit is "[a]ny proceeding by a party or parties against another in a court of law." *Suit*, Black's Law Dictionary (11th ed. 2019). The modern legal definition of "process" is "[t]he proceedings in any action or prosecution." *Process*, BLACK'S LAW DICTIONARY (11th ed. 2019). Based on these definitions, "suit" in the modern legal sense encompasses both "suit" and "process" as those words were used in the mid-nineteenth century. Congress therefore needed to join the terms with the disjunctive "or" in order to properly establish the scope of § 1500's jurisdictional bar. If Congress were to enact the same provision today, the statute would presumably only require use of the term "suit" to accomplish this same objective. Analyzing the surrounding text therefore clarifies the Court's understanding of "process" within § 1500.

*Nycal*, 148 Fed. Cl. at 14.

*Id.* Fourth, the Court evaluated "process" within § 1500's broader statutory context to "clarify what type of proceeding before another court would preclude this Court from exercising jurisdiction." *Id.* at 15. The Court concluded "'process' means the entire course of legal proceedings."[4] *Id.* The Court noted, as used in "§ 1500, a 'process' must equal a previously filed 'cause of action' in another court" to strip this court's jurisdiction over a later-filed claim. *Id.* at 18 n.9. Ultimately, the Court concluded "under the Court's interpretation of the terms 'suit' and 'process' in 1868," "Nycal's appeal of [a] denied motion to intervene" was neither a suit nor a process. *See id.* at 17–18.

## III. The Parties' Arguments Regarding the Government's 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

### A. The Government's Argument the Court Lacks Jurisdiction Under § 1500

The government contends plaintiff's Complaint is barred by 28 U.S.C. § 1500 because plaintiff's filing in this court on 5 October 2023 overlapped with the period plaintiff's appeal was pending at the Fourth Circuit—7 August 2023 to 29 November 2023. Gov't MTD at 3. The government argues "[w]hether an earlier-filed 'suit or process' is 'pending' for § 1500 purposes is determined at the time the complaint is filed with the Court of Federal Claims." *Id.* (quoting *Brandt v. United States*, 710 F.3d 1369, 1375 (Fed. Cir. 2013)). Further, according to the government, "[t]wo suits are for or in respect to the same, precluding jurisdiction in the CFC . . . if they are based on substantially the same operative facts, regardless of the relief sought in each suit." *Id.* at 4 (quoting *United States v. Tohono O'Odam Nation*, 563 U.S. 307, 317 (2011)). Therefore, the government concludes, "[t]his case and the Fourth Circuit case are based on the same operative facts. They both arose from the same dispute involving the same contract: USACE requires the [Special Tactics Team] building to comply with ATFP standards, and Leebcor claims it need not meet those standards." *Id.* According to the government, "[t]he only way to cure the jurisdictional defect is for the Court to dismiss the present complaint, and for Leebcor to refile." *Id.* at 5.

The government similarly argues in its Reply, "[j]urisdictional statutes that condition the Government's waiver of sovereign immunity should be construed strictly[,]" Gov't's Reply at 1 (citing *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)), and emphasizes "[t]he CFC . . . has no jurisdiction over a claim if the plaintiff has another suit for or in respect to that claim pending against the United States or its agents." *Id.* (quoting *Tohono O'Odham Nation*, 563 U.S. at 311). The government contends the evidence and act or contract tests often employed for

---

[4] The Court summarized in *Nycal*:

> After analyzing the meaning of "process" in § 1500 using the above four steps, the Court finds "process" means the entire course of legal proceedings. Nothing in the statute or broader statutory context modifies the original meaning of "process," based on the original meaning, as gleaned from passage-era dictionary definitions. *See Gamble v. United States*, [587 U.S. 678, 726] (2019) (Thomas, J., concurring) ("Our judicial duty to interpret the law requires adherence to the original meaning of the text.").

*Nycal*, 148 Fed. Cl. at 15.

§ 1500 analyses are not "the standard by which to measure whether two claims arise from substantially the same set of operative facts. Rather [these tests should only be used to] confirm that [a court's] conclusion [regarding res judicata] . . . [is] true to the principles encompassed in [§ 1500]." *Id.* at 5 (quoting *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1168 n.5 (Fed. Cir. 2011)). Finally, the government argues § 1500 applies "whether or not the district court [plaintiff filed in first] would have been able to exercise its jurisdiction . . . [because] whether or not the court where the claim is pending has jurisdiction is irrelevant." *Id.* at 6, 9 (quoting *Petro-Hunt, L.L.C. v. United States*, 862 F.3d, 1370, 1383 (Fed. Cir. 2017)). Even if "the relevant focus were the jurisdiction of the district court," the government argues, "mere lack of jurisdiction [is distinguished] from lack of 'colorable' jurisdiction" by the latter requiring a "'manifest abuse of authority.'" *Id.* at 9 (quoting *Acetris Health, LLC v. United States*, 949 F.3d 719, 729 n.4 (Fed. Cir. 2020)). The government contends "[h]ad the district court accepted Leebcor's arguments, it would be hard to say that it had manifestly abused its authority." *Id.* at 10.

### B.    Plaintiff's Arguments § 1500 Does Not Apply to this Case

In response, plaintiff argues "[b]ased on the District Court's holding, it never had jurisdiction over Leebcor's Prior Suit and, therefore, § 1500 is inapplicable to the present matter." Pl.'s Resp. at 1. In other words, per plaintiff, "this Court applies 28 U.S.C. § 1500 by considering (a) whether the plaintiff's earlier suit was pending when this Court's suit was filed, and (b) whether that earlier suit would have had a res judicata effect on this Court's suit." *Id.* at 5. Plaintiff therefore concludes, as "the District Court dismissed Leebcor's Prior Suit for lack of subject matter jurisdiction[, t]he District Court . . . lacked any power to rule on the merits of Leebcor's Prior Suit. Therefore, the filing of this matter is not precluded by 28 U.S.C. § 1500." *Id.* at 6. Plaintiff continues, according to the Federal Circuit, "if the prior court 'lacked colorable authority to consider [appellant's] appeal,' his earlier filing there "would not have preclusive effect under § 1500," and so § 1500 would not be a bar.'" *Id.* at 7–8 (citing *Tindall v. United States*, No. 2023-1139, 2023 WL 2881312 at *4 (Fed. Cir. 2023)). In the alternative, plaintiff contends "[e]ven if Section 1500 were applicable . . . [t]he underlying facts supporting the Prior Suit materially differ from the present [one]. As a result, the facts at issue do not satisfy either the evidence test or the act or contract test." *Id.* at 1–2. Plaintiff explains "[u]nder the act or contract test, [t]he true distinction between demands or rights of action which are single and entire, and those which are several and distinct, is, that the former immediately arise out of one and the same act or contract, and the latter out of different acts or contracts [and,] [u]nder the evidence test, two suits involve the same claim if the same evidence support[s] and establish[es] both the present and the former cause of action." *Id.* at 8 (quoting *Acetris Health*, 949 F.3d at 729). The operative facts between the district court action and the case here are not the same under the act or contract test, according to plaintiff, because "[t]he Prior Suit arose out of a congressional appropriation, not the contract at issue in this case." *Id.* at 10. Similarly, under the evidence test, plaintiff alleges "the legally operative facts differ significantly between the Prior Suit and this matter . . . [because] no contract was mentioned in the Prior Suit and the DD Form 1391 predated and exists independent of the contract that forms the basis of this matter." *Id.* at 11.

### C.     The Government's New Arguments at Oral Argument Related to the Application of § 1500 to this Case

Despite a substantive status conference on 28 February 2024 discussing the parties' cited cases, the government presented three cases not previously cited by either party at oral argument. *See* Tr. at 6:17–21.  When questioned on these cases, however, the government was unfamiliar with them and could not engage with their basic factual and procedural histories.  *See* Tr. at 84:4–22.

First, the government proffered *Hood v. United States* to urge the Court to compare the operative facts between the district court complaint and the complaint in this case to determine whether § 1500 bars the instant action.  *See* Tr. at 66:23–67:13.  Second, the government raised *Dunklebarger v. Merit Systems Protection Board*, which considered if the Civil Service Reform Act deprived the Merit Systems Protection Board (MSPB) of jurisdiction.  *See* Tr. at 71:11–13.  Third, the government raised *Newell Companies v. Kenney Manufacturing Company* to argue a prior Federal Circuit decision is binding on subsequent panels.  *See* Tr. at 89:2–11; *Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757 (Fed. Cir. 1988).  The government also presented the Court with Court of Federal Claims ECF dockets as examples of plaintiffs voluntarily dismissing complaints and refiling shortly thereafter to cure § 1500 jurisdiction defects.  *See* Tr. at 5:16–22.

## IV.    The Federal Circuit's Precedent in *Acetris* and *Tindall* on the Relevance of Jurisdiction to § 1500

Plaintiff argues pursuant to the Federal Circuit's decisions in *Acetris* and *Tindall* the prior court must have "colorable jurisdiction" for a res judicata effect to apply under § 1500.  Pl.'s Resp. at 6.  The government contends *Acetris* and *Tindall* are neither correct nor precedential, *see infra*, but even accepting *Acetris* and *Tindall* as good law, the government argues neither would apply here because the district court had "colorable jurisdiction."  Gov't Reply at 6–7; Tr. at 78:18–80:13.  In *Acetris*, the Federal Circuit addressed whether the plaintiff's claims before the Court of International Trade (CIT) barred a subsequent suit in this court.  *See Acetris Health, LLC v. United States*, 949 F.3d 719, 729–30 (Fed. Cir. 2020) ("The government contends that Acetris' previously filed pending suits in the CIT . . . divest the Claims Court of jurisdiction under 28 U.S.C. § 1500.").  In recognizing at least one of the plaintiff's claims implicated the Federal Acquisition Regulations (FAR), the Federal Circuit determined the agency "had no colorable authority to opine on the FAR."  *Id.* at 729.  As such, the Federal Circuit held the "CIT . . . lacks colorable jurisdiction to review the merits of a[n agency] decision on Acetris' FAR compliance (which the [agency] did not have authority to make in the first instance)."  *Id.* Accordingly, per the Federal Circuit, "any decision by the CIT on this claim would not have res judicata effect," meaning "any factual allegations in the CIT complaint pertaining . . . to this claim do not have preclusive effect under section 1500."  *Id.*  In a footnote, the *Acetris* court went so far as to note "we do not read [the Supreme Court's decision in *Tohono O'Odham Nation*] to override the principle that a court cannot rule on the merits of—and thus res judicata effect cannot arise from—a claim over which the court has no colorable jurisdiction."  *Id.* at 729 n.4.  Likewise, in *Tindall*, the question presented related to § 1500's application to claims already pending before the United States Tax Court.  *Tindall v. United States*, No. 2023-1139,

2023 WL 2881312, at *3–*4 (Fed. Cir. 2023).  In remanding the case back to this court for
further consideration, the Federal Circuit explicitly recognized, "[the Federal Circuit has] held
that the res judicata standard would not be satisfied where the earlier suit was filed in a tribunal
that 'had no colorable authority' to address it."  *Id.* at *3 (citing *Acetris Health*, 949 F.3d at 729).
Specifically, the court noted, "if the Tax Court lacked colorable authority to consider Mr.
Tindall's appeal . . . § 1500 would not be a bar."  *Id.* at *4.

*Acetris* stands for the proposition § 1500 does not apply when the court of first filing did
not have jurisdiction, as any decision by that court would not have res judicata effect.  *Acetris
Health*, 949 F.3d at 729.  The Federal Circuit reiterated this interpretation in *Tindall*.  *Tindall*,
2023 WL 2881312, at *4.  At oral argument, the government contested the holding in *Acetris*
primarily because, in the government's view, the Federal Circuit was wrong.  Tr. at 72:8–21
("THE COURT:  In *Acetris* the Federal Circuit held because the Court of International Trade
lacked 'colorable jurisdiction' to review plaintiff's claims, and 'any decision by the CIT would
not have res judicata effect, and any factual allegations in the CIT complaint do not have
preclusive effect under Section 1500.'  And you agree with that holding?  [GOVERNMENT]:
No, Your Honor.  THE COURT:  You disagree with the Federal Circuit's holding?
[GOVERNMENT]:  In *Acetris*, yes.  THE COURT:  So in *Acetris*, then, the Government argues
the Fed Circuit got it wrong?  [GOVERNMENT]:  I think that's right[.]"); *see also* Tr. at 75:25–
76:23 (discussing *Acetris* and *Tindall*); Tr. at 77:7–78:17 (discussing *Acetris*, *Tohono*, and *Petro-
Hunt*).  *Tindall*—although making no holding on jurisdiction—set forth the same exception to §
1500 as *Acetris*, recognizing § 1500 does not apply when the previous court did not have
jurisdiction.  *Tindall*, 2023 WL 2881312, at *4.  The government similarly disagrees with
*Tindall*, arguing again the Federal Circuit was simply wrong.  Tr. at 76:21–23 ("THE COURT:
Just to confirm, you don't agree with *Tindall*, and you don't agree with *Acetris*?
[GOVERNMENT:]  [R]ight. . . ."); *see also* Tr. at 73:14–25; Tr. at 74:24–75:9.  The government
urges the Court to eschew the Federal Circuit's guidance in these cases and instead rely on
*Petro-Hunt*, which was decided prior to *Acetris* and *Tindall*.  As discussed *infra* Section V.A,
however, the relevant portion of *Petro-Hunt* is *dicta* and is therefore not binding.

Even accepting *Acetris* as precedential, the government contends *Acetris* set forth an
exception to § 1500 not applicable here because the district court did have "colorable authority."
Tr. at 78:18–79:25; *Tindall*, 2023 WL 2881312 at *3–*4.  As explained at oral argument, the
government understands a lack of "colorable authority" to require a "manifest abuse of
authority," meaning an action taken by a court severely beyond its jurisdiction.  Tr. at 78:18–
79:25; *see also* Tr. at 80:1–13 ("THE COURT:  . . . Your distinction is that colorable authority is
a very extreme thing?  [GOVERNMENT]:  Exactly.  The word 'colorable' is doing something.
It can't just be a lack of jurisdiction means you lack colorable authority.  It has to be so obvious
that there's no jurisdiction, that it would be a manifest abuse of authority to even find otherwise.
So . . . it wouldn't have risen to that level of abuse of authority.").  While the government did not
provide a definition for "manifest abuse of authority," the government suggested a bankruptcy
court holding a criminal trial would rise to the level of "manifest abuse of authority."  Tr. at
78:24–79:25 ("[GOVERNMENT:]  I don't think that exception would apply anyway because . .
. for the District Court to have exercised jurisdiction over Leebcor's complaint, that would not
have been correct, but would it have risen to a manifest abuse of authority comparable to
bankruptcy court holding a criminal trial?  No.  So . . . even if that exception were good law, it

- 11 -

would not apply here."). The district court exercising jurisdiction over plaintiff's complaint would not, in the government's view, rise to that level. *See id.* Thus, the government argues the district court had "colorable authority," so the *Acetris* exception—even if correct and applicable—does not save Leebcor's case. Contrary to the government's argument, however, the Federal Circuit in *Acetris* and *Tindall* expressly stated where the court of first filing "lacked colorable authority. . . § 1500 would not be a bar." *Tindall*, 2023 WL 2881312, at *3 (citing *Acetris*, 949 F.3d at 729). Where—as here—the first court dismissed for lack of subject matter jurisdiction, there is little dispute the court of first filing "lacked colorable authority" or "colorable jurisdiction" to hear plaintiff's claims. *Id.*; *see also Acetris Health*, 949 F.3d at 729. Indeed, the Eastern District of North Carolina determined it "lack[ed] subject matter jurisdiction" over plaintiff's claim, leading it to conclude Leebcor's "complaint *must be dismissed*." Dismissal Order at 5, ECF No. 27, *Leebcor Services, LLC v. United States Army Corps of Eng'rs et al.*, No. 5:23-70, (E.D. N.C. Aug. 1, 2023) (emphasis added). Thus, the Federal Circuit's holding in *Acetris*, reiterated in *Tindall*, mandates § 1500 not apply here as "any decision by the [Eastern District of North Carolina] would not have [had] res judicata effect." *Acetris Health*, 949 F.3d at 729, n.4 ("[W]e do not read [the Supreme Court's decision in] *Tohono* to override the principle that a court cannot rule on the merits of—and thus res judicata effect cannot arise from—a claim over which the court has no colorable jurisdiction."). The Court accordingly denies the government's Motion to Dismiss. *Id.*; *accord Nycal Offshore Dev. Co. v. United States*, 148 Fed. Cl. 1, 18 (2020) (holding § 1500 does not apply where the plaintiff "was never granted entry into the" earlier filed suit, meaning there was no "pending 'process'" or suit capable of imposing a res judicata effect). The Court notes applying § 1500 only where the court of first filing has proper jurisdiction to hear the claims at issue aligns with the historical understanding of § 1500 to "curb duplicate lawsuits," *Tohono*, 563 U.S. at 311. *Compare Acetris Health*, 949 F.3d at 729, and *Tindall*, 2023 WL 2881312 at *3–*4, *with Petro-Hunt*, 862 F.3d at 1383.

## V.     Other Caselaw Related to the Applicability of § 1500 to this Case

As mentioned, *supra* Section III.C, the government presented three additional cases and Court of Federal Claims ECF dockets on the morning of oral argument in support of its briefing. The government referenced these cases in conjunction with *Petro-Hunt* to argue § 1500 should bar plaintiff's claims. The government first raised *Hood v. United States* to urge the Court to compare the operative facts between the district court complaint and the complaint in this case in deciding the government's Motion. *See* Tr. at 66:22–67:13. Next, the government raised *Newell Companies v. Kenney Manufacturing Company* to argue a prior Federal Circuit decision is binding on subsequent panels. *See* Tr. at 89:2–11. Last, the government raised *Dunklebarger v. Merit Systems Protection Board* to argue the principles of estoppel do not apply to jurisdiction. *See* Tr. at 71:11–13. The government also presented a number of Court of Federal Claims ECF dockets to give examples of situations in which a plaintiff voluntarily dismissed and refiled to cure a § 1500 defect. *See* Tr. at 10:3–14.

### A.     Whether *Petro-Hunt*'s Statement Regarding the Relevance of Jurisdiction to § 1500 is Binding

The government argues under *Petro-Hunt* the district court's lack of jurisdiction does not allow plaintiff to bypass § 1500. Gov't's Reply at 6. At oral argument, the government emphasized multiple times "*Petro-Hunt* says jurisdiction is irrelevant." Tr. at 77:3–4; Tr. at 76:23–24; Tr. at 73:12–13; Tr. at 78:8–12; Tr. at 83:4–8. Despite repeatedly invoking *Petro-Hunt* at oral argument, the government struggled to recall even its basic procedural history. Tr. at 80:14–82:6 ("THE COURT: Let's turn to *Petro-Hunt*. So there, to understand the procedure, plaintiff's complaint was filed when summary judgment motions were pending in District Court? . . . [GOVERNMENT:] I don't know. I would have to . . . read the case again. . . . THE COURT: So if we look at 1375, 1376, it says, 'On August 24, 2000, while summary judgment motions were pending in the District Court, Petro-Hunt filed a complaint in the Court of Federal Claims." . . . Is that procedurally correct? . . . Do you have any reason to disagree with it? [GOVERNMENT]: No. THE COURT: So that's a pretty big procedural difference, correct? [GOVERNMENT]: It's irrelevant, Your Honor."). In *Petro-Hunt*, the plaintiff brought suit in this court while summary judgment motions were pending in district court. *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1376 (Fed. Cir. 2017). This court dismissed a portion of plaintiff's claims under § 1500, finding the claims were essentially the same as those before the district court. *Id.* at 1377. On appeal, the plaintiff argued "§ 1500 should not bar a claim where the potential for duplicative litigation is not possible." *Id.* at 1383. Specifically, Petro-Hunt asserted duplicative litigation was not possible because only this court "ha[d] exclusive jurisdiction over" the kind of claims in issue there—namely, "takings claims for more than $10,000." *Id.* The Federal Circuit, first finding "the district court did have jurisdiction over the . . . claim on its face," disagreed, holding "[s]ection 1500 . . . applie[s] in this case because Petro-Hunt filed essentially the same case twice, pleading an unconstitutional taking in both district court and the Court of Federal Claims." *Id.* at 1383–84. In passing *dicta*, the Federal Circuit then noted, "whether or not the court where the claim is pending has jurisdiction is irrelevant" to the § 1500 analysis. *Id.*

Although the government argues the Federal Circuit's statement in *Petro-Hunt*— "whether or not the court where the claim is pending has jurisdiction is irrelevant"—is binding on this court, this pronouncement came only after the Federal Circuit determined "the district court *did have jurisdiction*" over the takings claim on its face." *See id.* (emphasis added). The Federal Circuit therefore "affirm[ed] the Court of Federal Claims' finding that . . . [the plaintiff's] claims . . . are barred by 28 U.S.C. § 1500," *id.* at 1381, after finding the first court "did have jurisdiction." *Id.* at 1384. The Federal Circuit's opining on § 1500 in the absence of jurisdiction was therefore *dicta* not binding on this court or subsequent Federal Circuit panels. *See Osaka Shosen Kaisha Line v. U.S.*, 300 U.S. 98, 103 (U.S. 1937) ("It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.") (quoting *Cohens v. State of Virginia*, 19 U.S. 264, 399–400 (1821)). At oral argument, however, the government disagreed this is *dicta*. Tr. at 83:9–22 ("THE COURT: Well, as the earlier courts did have jurisdiction in *Petro-Hunt*, does the Government agree that the Federal Circuit's statement . . . [']whether or not the District Court would have been able to exercise jurisdiction over plaintiff's takings claims is irrelevant['] . . . that statement is *dicta*? It has nothing to do with the holding? [GOVERNMENT]: No, Your Honor, it's not *dicta*. THE COURT: Why is it not *dicta*? [GOVERNMENT]: Because it's one of the reasons that the

Court is giving for its holding.  It's . . . given multiple reasons to justify the holding.  That doesn't make one of the reasons *dicta*.") (emphasis added).  To the extent the government argues the *Petro-Hunt* court's statement—in a case in which the first court "*did* have jurisdiction"— about the application of § 1500 in cases where the first court *lacks jurisdiction*, is not *dicta*, the government fundamentally misunderstands *dicta*:  "*[G]eneral expressions, in every opinion . . . [i]f they go beyond the case . . . may be respected, but ought not to control the judgement in a subsequent suit, when the very point is presented for decision.*"  *Osaka Shosen Kaisha Line*, 300 U.S. at 103 (emphasis added).  The Federal Circuit held "[s]ection 1500 . . . applied in this case because Petro-Hunt filed essentially the same case twice" and only addressed the relevance of jurisdiction—finding "the district court *did have jurisdiction* over the takings claim on its face"—to reject to the plaintiff's alternative argument "the district court would not have been able to assert jurisdiction over its takings claims."  *Petro-Hunt*, 862 F.3d at 1383 (emphasis added).  The Federal Circuit's statement "whether or not the court where the claim is pending has jurisdiction is irrelevant," *id.*, is therefore "beyond the case," so "may be respected, but ought not control the judgement" in this case.  *Osaka Shosen Kaisha Line*, 300 U.S. at 103.  The Court therefore declines to apply *Petro-Hunt* to the extent it suggests jurisdiction is irrelevant to applying § 1500 and is in conflict with the binding holding of *Acetris* and the rule set forth in *Tindall*.  *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 17 (2003) (Scalia, J., dissenting) ("Dicta of course have no precedential value, even when they do not contradict, as they do here, prior holdings of the Court.") (citing *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994)).

Finally, the Court notes *Petro-Hunt* is procedurally dissimilar to this case as, unlike here where plaintiff's district court case was dismissed prior to filing in this court, in *Petro-Hunt*, there were summary judgment motions pending at the district court.  The court in *Petro-Hunt* therefore did not consider—as the Court must here—whether a pending appeal precludes this court's jurisdiction under § 1500.  Perhaps more significantly, *Petro-Hunt* is further distinguished from *Acetris*, *Tindall*, and this case because the district court in *Petro-Hunt* had jurisdiction.  Therefore, in *Petro-Hunt* "jurisdiction [was] irrelevant."  *Petro-Hunt*, 862 F.3d at 1383 ("[T]he district court did have jurisdiction over the takings claim on its face.").  While the government agreed the district court's jurisdiction in *Petro-Hunt* distinguishes the case from *Acetris* and *Tindall*, the government disagreed the distinction was relevant.  Tr. at 83:1–8 ("THE COURT:  That's pretty different than the Fourth Circuit and the District Court here not having jurisdiction.  [GOVERNMENT]:  Well, that's a difference, but *Petro-Hunt* also said that whether the District Court would have been able to exercise jurisdiction because of relevance, and it said that twice.  So according to *Petro-Hunt*, that distinction is irrelevant.").  The government could not, however, reasonably explain the apparent conflict between *Petro-Hunt*'s dicta and the holding in *Acetris* and rule in *Tindall*.  Tr. at 84:8–17 ("THE COURT:  Well, besides the Government's attempt to distinguish 'colorable jurisdiction' from jurisdiction, is there any other identified reason why the Federal Circuit's statement in Petro-Hunt appears to diverge from *Acetris* and *Tindall*?  [GOVERNMENT]:  Not that I'm aware of, but . . . I can't prove a negative.  So I'm not aware of anything, at least that's relevant to the issue before the Court now, that's raised in *Petro-Hunt*.") (emphasis added).  Thus, given these factual and procedural distinctions between this case and *Petro-Hunt*, *Petro-Hunt* is less relevant than the more similar *Acetris* and *Tindall*.  *Compare Acetris Health*, 949 F.3d at 729, and *Tindall*, 2023 WL 2881312 at *3–*4, *with Petro-Hunt*, 862 F.3d at 1383.

### B. Whether *Newell* is Relevant Insofar as *Petro-Hunt* Conflicts with *Acetris*

The government cites *Newell* for the proposition "prior decisions of a panel of the [Federal Circuit] are binding precedent [on] subsequent panels." Tr. at 89:2–11; *see Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc*."). The government argues, to the extent *Petro-Hunt* conflicts with *Acetris* and *Tindall* as to whether a prior court's jurisdiction affects a § 1500 analysis, Tr. at 73:4–8, *Petro-Hunt* is precedential under *Newell* as the Federal Circuit decided *Petro-Hunt* before *Acetris* and *Tindall*. *See id*. *Newell*, however, is applicable only to the extent *Petro-Hunt* is binding precedent. *See* Tr. at 89:2–11; *Newell*, 864 F.2d at 765. As discussed, *supra*, the portions of *Petro-Hunt* cited by the government are *dicta* and are therefore not binding on this court or on the *Acetris* panel. *Newell*, 864 F.2d at 765. As such, *Acetris* is good law, and *Newell* is irrelevant to this case.

### C. Whether the Additional Cases Raised by the Government are Applicable to § 1500

The Court next considers the remaining new cases and dockets raised by the government at oral argument. First, the government proffered *Hood v. United States* to urge the Court to compare the operative facts between the district court complaint and the complaint in this case to determine whether § 1500 bars the instant action. *See* Tr. at 66:22–67:13. Despite raising *Hood*, the government was unprepared to engage with the Court in discussing the case. Tr. at 87:4–22 ("THE COURT: . . . I'm just wondering, yes or no, did the District Court allege it did not have jurisdiction? [GOVERNMENT]: I haven't looked at the actual order issuing from the District Court. I'm going off of the characterization of it. . . . I don't know for sure if the District Court's decision was based on jurisdiction or maybe alternatively jurisdiction and failure to state a claim."). In *Hood*, the plaintiff's complaint in the district court was dismissed because it was "barred by [a] . . . Settlement Agreement, [was] untimely, and evidence[d] a failure to exhaust administrative remedies." *Hood v. United States*, 127 Fed. Cl. 192, 206. The plaintiff's Sixth Circuit appeal of this dismissal was pending when the plaintiff filed in this court. *Id*. While the government argued under *Hood* the Court should compare the operative facts between the district court complaint and the complaint in this case, Tr. at 66:23–67:13, *Hood* did not consider the question of the prior court's jurisdiction, rather it considered whether the plaintiff's case "pending on appeal in the Sixth Circuit" had sufficiently comparable "allegations and facts alleged" to "meet the analytical framework set forth in *Tohono O'Odham Nation*."[5] *Hood*, 127 Fed. Cl. at 206. As discussed, *supra*, under *Acetris* § 1500 does not apply when the prior court lacks jurisdiction. Thus, *Hood* is factually dissimilar to this case and does not alter the Court's analysis as the government's Motion to Dismiss fails under *Acetris*.

Second, the government raised *Dunklebarger v. Merit Systems Protection Board* to argue the principles of estoppel do not apply to jurisdiction. *See* Tr. at 71:11–13. In *Dunklebarger*, the plaintiff appealed a denied agency request to the MSPB. *Dunklebarger v. Merit Sys. Protec. Bd.*,

---

[5] For completeness, the Court conducts a comparative analysis of plaintiff's Eastern District of North Carolina complaint and the Complaint filed in this court *infra* Section VI.B.

130 F.3d 1476, 1477 (Fed. Cir. 1997). The MSPB dismissed the appeal for lack of jurisdiction, and the plaintiff appealed to the Federal Circuit. *See id.* On appeal, the Federal Circuit considered whether Section 7121 of the Civil Service Reform Act deprived the MSPB of jurisdiction and, in a decision inapposite to this case, held "5 U.S.C. § 7121(a) [] does not ordinarily permit an employee to choose between the negotiated grievance procedures [under a collective bargaining agreement] and an appeal to the" MSPB. *Id.* at 1476–77. Notably, *Dunklebarger* does not address § 1500, a distinguishing factor acknowledged by the government at oral argument. Tr. at 90:6–10 ("THE COURT: To confirm, is *Dunklebarger* a Section 1500 case? [GOVERNMENT]: No, Your Honor. THE COURT: Does it mention 1500? [GOVERNMENT]: No, Your Honor."). As such, *Dunklebarger* does not apply to this case.

Finally, the government offered three Court of Federal Claims ECF dockets to demonstrate plaintiffs may cure § 1500 deficiencies by voluntarily dismissing and refiling their cases. *See* Tr. at 10:3–4 (discussing *RQ Squared, LLC v. United States*, No. 12-527 (Fed. Cl. Aug 21, 2012)); Tr. at 10:8–10 (discussing *Operating Engineers Trust Fund of Washington, D.C. v. United States*, No. 19-353 (Fed. Cl. Nov 3, 2017)); Tr. at 10:12–14 (discussing *Electrical Welfare Trust Fund v. United States*, No. 17-1732 (Fed. Cl. Mar 8, 2019)). While the Court acknowledges plaintiffs may do so, and the Court could waive filing fees, the dockets raised by the government do not indicate plaintiffs are required to voluntarily dismiss and refile when facing a § 1500 motion to dismiss. At oral argument, plaintiff expressed no interest in voluntarily dismissing. Tr. at 70:3–16 ("THE COURT: . . . Plaintiff confirms that they have no interest in that? [PLAINTIFF]: The Government could also just withdraw their motion as well, Your Honor. . . . If we refile, then that would be practically the same thing as them withdrawing the motion. This case would not be going away. So I know the focus was on whether or not we would just refile, but they could easily withdraw the motion and just obviate the issue in its entirety."). Indeed, plaintiff did not voluntarily dismiss because plaintiff believes the Federal Circuit's precedent in *Acetris* is favorable to plaintiff's position. *See generally* Pl.'s Resp.

## VI.   The Original Public Meaning of § 1500 as Applied by this Court and to this Case

As concluded, *supra*, under *Acetris* and *Tindall* § 1500 does not apply to this case. The Court accordingly denies the government's Motion to Dismiss. Assuming *arguendo* § 1500 applies, however, the Court considers "whether there is an earlier-filed 'suit or process' pending in another court" that is "for or in respect to" the claim filed in this court. *Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013). When the Court makes a § 1500 determination, it must look at what was pending when the plaintiff filed its complaint in this court. *Id.* at 1380 ("[A]t the time [the plaintiff] filed the instant case, he had no 'suit or process against the United States' pending in any other court."). In *Nycal*, the Court considered whether the pending appeal was "for or in respect to" the claim filed in this court, *Nycal Offshore Dev. Corp. v. United States*, 148 Fed. Cl. 1, 18 (2020), but at oral argument, the government disagreed with the Court's *Nycal* analysis and argued the Court should instead compare the "claim that was . . . filed in the District Court" to the Complaint here. Tr. at 68:5–14 ("THE COURT: . . . So here if the Court finds that the Fourth Circuit appeal did not have the same operative facts, Section 1500 would not apply? [GOVERNMENT]: That's not [the] right analysis the Court should be doing. The Court should be comparing the claim. Not what the Fourth Circuit had to decide. Not the issues that were before the Fourth Circuit. The claim that was pending. The claim that was

pending comes from the complaint that was filed in District Court.").  The Court therefore first considers whether plaintiff's complaint in the district court was "for or in respect to" the claim now before this Court before evaluating whether plaintiff's appeal at the Fourth Circuit was "for or in respect to" this claim.

### A.   Whether Plaintiff's Action in the Eastern District of North Carolina was "For or in Respect to" Plaintiff's Action Filed in this Court

Before considering the Court's statutory interpretation of § 1500 as discussed in *Nycal*, the Court notes its disappointment with the lack of preparation by the government.  Despite discussing *Nycal* extensively during the 28 February 2024 status conference and notifying the parties it would again be covered at oral argument, the government was unfamiliar with *Nycal* and was unable to substantively engage with the Court on its statutory interpretation detailed therein.  *See, e.g.,* Tr. at 33:19–34:1; Tr. at 38:1–39:20; Tr. at 40:23–41:7; Tr. 45:2–25.  At oral argument, the government did not disagree with the Court's interpretation of "process" in *Nycal* as "the entire course of legal proceedings," however.  Tr. at 38:1–39:20.  The government also did not disagree with the Court's interpretation of "suit" and "process" as being distinct.  Tr. at 45:2–25.  The Court therefore applies its interpretation of § 1500 in *Nycal* here.

For plaintiff's claim before this court to be barred by § 1500, plaintiff's cause of action must "equal a previously filed 'cause of action' in another court."  *Nycal*, 148 Fed. Cl. at 18 n.9 (citing 28 U.S.C. § 1500).  As explained by the Court in *Nycal*:  "In *Tohono O'Odham Nation*, the Supreme Court viewed 'cause of action' [as] synonymous with 'case' and 'claim' as the necessary component to divest this Court of jurisdiction.  In [*Tohono O'Odham Nation*], the 'cause of action' was a nearly identical lawsuit with nearly identical facts filed in another court."  *Id.* at 18 n.9 (citing *Tohono O'Odham Nation*, 563 U.S. at 312).  As clarified at oral argument, in the Eastern District of North Carolina, plaintiff sought equitable relief under the APA related to the government's alleged violation of the ADA; in contrast, here, plaintiff seeks monetary damages for an alleged breach of contract.  Tr. at 19:16–23 ("THE COURT:  Just to confirm, it was seeking declaratory and injunctive relief under the APA?  [PLAINTIFF]:  Correct, Your Honor.  THE COURT:  Here your complaint seeks, 'review of the contracting officer's final decision as to breach of a written contract and requests only monetary judgment.'  [PLAINTIFF]:  Correct, Your Honor.").  According to plaintiff, the district court case was filed to enjoin the government and avoid potential criminal liability.  Tr. at 27:12–28:1 ("THE COURT:  . . . The goal with the District Court complaint was what?  [PLAINTIFF]:  So set forth in the District Court complaint, because it was an Antideficiency Act claim and Antideficiency Act allegation, that that would indirectly apply or could indirectly apply to Leebcor, that if they aided and abetted the Government in reconstructing the facility in violation of the Antideficiency Act, that we could be criminally liable. . . . I think that's definitely separate and apart from a remedy even though the injunctive relief versus monetary damages would be the remedy, but we were trying to avoid criminal penalties as well. . . ."); *see also* Tr. at 18:22–19:15 ("THE COURT:  Why voluntarily dismiss your appeal if you believe that these are two distinct cases?  [PLAINTIFF]:  Well . . . the primary thrust of that North Carolina case was to get an injunction to stop . . . construction.  That was the primary thrust of that, because as soon as we started construction and had to spend money, the concern was the client become insolvent.  So at the Fourth Circuit, once we appealed, we also moved for injunctive relief in the Fourth Circuit, and

- 17 -

once that failed and the project was already underway, there was no point in proceeding with the case because by the time the Fourth Circuit ruled, construction would most likely have been completed.  So the point would have been at least somewhat moot at that point.").  Notably, plaintiff did not reference the contract in its district court complaint; rather, only the government raised contract-related arguments in its motion to dismiss.  Tr. at 19:24–20:11 ("THE COURT: In the District Court case, did Leebcor raise any arguments regarding the administration of the contract?  [PLAINTIFF]:  No, Your Honor.  And we left out the contract from the complaint in that case.  We were concerned about res judicata effect, but we were under somewhat of an emergency and we needed to try to remedy the issue.  So we left out the reference of the contract in our complaint.  The Government raised it . . . We addressed it in moving papers, but it wasn't the subject of the complaint.  It was the mere appropriation and a violation of the Antideficiency Act.").  While the district court viewed plaintiff's claim as "plainly sound[ing] in contract," leading to dismissal, the district court acknowledged plaintiff did not characterize its claim as such.  Dismissal Order at 5, ECF No. 27, *Leebcor Services, LLC v. United States Army Corps of Eng'rs et al.*, No. 5:23-70, (E.D. N.C. Aug. 1, 2023) ("Plaintiff contends that its claims for declaratory and injunctive relief do not sound in contract as they are based on 'non-contractual sources,' specifically the DD Form 1391 and the demand letter.").  Indeed, even the government agreed plaintiff did not reference the contract in its complaint at the district court.  Tr. at 24:22–25:10 ("THE COURT:  [Government Counsel], isn't that the District Court clarifying that while the District Court might have disagreed where things were at, . . . at least the District Court admitted that Plaintiff thought they were not contract related?  [GOVERNMENT]:  I mean, that's a fair characterization of the Plaintiff's legal theory at the District Court . . .").  The government further agreed the APA—the basis for the district court action—and the CDA—the basis for this claim—are distinct.  Tr. at 33:7–14 ("THE COURT:  Is it that the Government would argue now that the question of subject matter jurisdiction under the APA is the same as breach of contract under the CDA?  [GOVERNMENT]:  As a matter of law, Your Honor?  THE COURT:  Yeah. [GOVERNMENT]:  Well, no.  That's different statutes.").

Although related, claims for relief under different statutes related to separate alleged violations of law are neither "equal" nor "nearly identical lawsuit[s]" as each draws on distinct facts relevant to the alleged violation of law.  *See Nycal*, 148 Fed. Cl. at 18 n.9 (citing *Tohono O'Odham Nation*, 563 U.S. at 311–12); *see* Tr. at 19:16–23 ("THE COURT:  Just to confirm, [you were] . . . seeking declaratory and injunctive relief under the APA?  [PLAINTIFF]:  Correct, Your Honor.  THE COURT:  Here your complaint seeks, . . . [']review of the contracting officer's final decision as to breach of a written contract and requests only monetary judgment.[']  [PLAINTIFF]:  Correct, Your Honor."); Tr. at 27:12–28:1 ("THE COURT:  . . . The goal with the District Court complaint was what?  [PLAINTIFF]:  So set forth in the District Court complaint, because it was an Antideficiency Act claim and Antideficiency Act allegation, that that would indirectly apply or could indirectly apply to Leebcor, that if they aided and abetted the Government in reconstructing the facility in violation of the Antideficiency Act, that we could be criminally liable. . . . I think that's definitely separate and apart from a remedy even though the injunctive relief versus monetary damages would be the remedy, but we were trying to avoid criminal penalties as well. . . ."); *see also* Tr. at 18:22–19:15; Tr. at 19:24–11 ("THE COURT:  In the District Court case, did Leebcor raise any arguments regarding the administration of the contract?  [PLAINTIFF]:  No, Your Honor.  And we left out the contract from the complaint in that case.  We were concerned about res judicata effect, but we were under

- 18 -

somewhat of an emergency and we needed to try to remedy the issue.").  The Court accordingly finds plaintiff's claim here is not "for or in respect to" plaintiff's claim in the Eastern District of North Carolina.  *Nycal*, 148 Fed. Cl. at 18 n.9; *see also Tohono O'Odham Nation*, 563 U.S. at 312.

### B.    Whether Plaintiff's Appeal was a Pending "Suit or Process" Within the Meaning of § 1500

As plaintiff's district court action was dismissed before this case was filed, the Court next considers whether the Fourth Circuit appeal was a "vehicle through which [plaintiff] kept" an "equal . . . previously filed 'cause of action' in another court" alive for § 1500 purposes.  *Nycal*, 148 Fed. Cl. at 16, 18 n.9.  The Federal Circuit specified in *Brandt*, "once a claim is dismissed or denied, it is no longer 'pending' for § 1500 purposes until a motion for reconsideration or notice of appeal is filed." *Brandt*, 710 F.3d at 1379–80.  Therefore, when the district court dismissed plaintiff's action on 31 July 2023 for lack of jurisdiction, plaintiff's suit was no longer pending.  *See* Gov't's MTD at 2.  When Leebor filed its Complaint in this court on 5 October 2023, however, it had already appealed the Eastern District of North Carolina's dismissal for lack of subject matter jurisdiction to the Fourth Circuit.  *See id.*  As noted *supra* Section VI.A, however, the action filed in the Eastern District of North Carolina was not alleging the same claims as those filed in this case.  Thus, when plaintiff appealed the district court's dismissal for lack of subject matter jurisdiction of that dissimilar case—a request for an injunction under the ADA— the pending appeal was likewise dissimilar to this case for § 1500 purposes.  *See* Tr. at 32:17–24 ("THE COURT:  . . . Mr. Mandlebaum, regarding your motion to dismiss in the District Court case, you agree that subject matter jurisdiction is a threshold issue and that's what the Court decided?  [GOVERNMENT]:  Yes, Your Honor.  THE COURT:  And that the District Court never reached the merits of the case?  [GOVERNMENT]:  No, no, it did not."); Gov't's MTD, Ex. 1 at A28 (Emergency Mot. For Inj. Pending Appeal and Req. For Expedited Br. Schedule, *Leebcor Services, LLC v. United States Army Corps of Eng'rs et al.*, No. 23-1814 (4th Cir. Aug 7, 2023)).  *Tohono O'Odham Nation* suggests § 1500 applies when there are nearly identical lawsuits, but here plaintiff's appeal is not identical to the instant case because plaintiff appealed a dissimilar district court case requesting injunctive relief under the APA on jurisdictional grounds, *supra*.  *See Nycal*, 148 Fed. Cl. at 18 n.9 ("In *Tohono O'Odham Nation*, the Supreme Court viewed 'cause of action' [as] synonymous with 'case' and 'claim' as the necessary component to divest this Court of jurisdiction.  In [*Tohono O'Odham Nation*], the 'cause of action' was a nearly identical lawsuit with nearly identical facts filed in another court.").  This accords with this court's reasoning in *Nycal*, where the plaintiff's "appeal of [a] denied motion to intervene" was neither a suit nor a process within the meaning of § 1500 capable of imposing a res judicata effect because plaintiff "was never granted entry into the original 'suit.'"  *See Nycal*, 148 Fed. Cl. at 17–18.  Indeed, here, although plaintiff had an appeal pending in the Fourth Circuit at the time of filing in this case, it was not equal to, or based on the same operative facts as, the instant case.  *See supra*.  Plaintiff's Fourth Circuit case thus "[c]ould not have res judicata effect" in this court, *see supra* Section IV, meaning—as in *Nycal*—there was no risk of duplicative lawsuits.  *Tohono O'Odam Nation*, 563 U.S. at 311–12.

### C.    Whether the Government's Interpretation of § 1500 Conforms with the Statute's Original Public Meaning

Although *Nycal* is factually distinct from this case, the Court's interpretation of the original public meaning of § 1500 there is relevant and applicable here.  Congress enacted § 1500 after the Civil War to address the myriad cotton claimants who "sued the United States in the Court of Claims . . . while at the same time suing federal officials in other courts, seeking relief under tort law for the same alleged actions."  *Tohono O'Odam Nation*, 563 U.S. at 311–12.  Congress intended "to curb [these] duplicate lawsuits."  *Id.* at 311.  As discussed *supra*, different from the cotton claimants, plaintiff did not have a pending suit or process equal to, or based on the same operative facts as, the instant case when this case was filed.  Similarly, unlike the cotton claimants who sued both the federal government and federal officials "to recover [monetarily from both] for cotton taken" during the Civil War, *Nycal*, 148 Fed. Cl. at 7, plaintiff first sought *district court equitable relief under the APA* to avoid insolvency and criminal liability but now seeks *monetary relief for breach of contract in the Court of Federal Claims*.  *See supra* Section VI.A; Tr. at 18:22–19:15.  This further assuages any risk of duplicative lawsuits.  Finally, although not relevant to the Court's analysis, *see Brandt*, 710 F.3d at 1380, plaintiff's Fourth Circuit appeal is no longer pending—and was not pending at the time the government filed its instant Motion to Dismiss—because of plaintiff's voluntary dismissal.  *See* Gov't's MTD at 2.

While the government was unable to substantively engage with the Court on the original public meaning of § 1500 as discussed in *Nycal*, the government did not disagree with the Court's discussion of the history of § 1500.  Tr. at 33:19–34:1.  To that end, the government acknowledged, while there was a potential for duplicative lawsuits at the time this suit was filed, there is currently no such risk as plaintiff voluntarily dismissed its Fourth Circuit appeal.  Tr. at 34:8–17; Tr. at 36:17–37:1 ("THE COURT:  . . . [H]ow [does] that interpretation satisf[y] the original meaning and intent[?]  [GOVERNMENT]:  Well, like I said, when they filed it, the Government was subjected to litigation in multiple courts, which is what the statute was seeking to avoid.  I had to talk to an Assistant United States Attorney handling a different case with Leebcor to figure out what to do with this case.  So that's what the statute was designed to avoid.").  Granting the government's motion would therefore not serve to "curb duplicate lawsuits."  *Tohono O'Odam Nation*, 563 U.S. at 311–12.

Finally, the Court notes the problematic nature of current § 1500 jurisprudence.  As one example, at oral argument, the government pointed to a potential loophole available to litigants wherein plaintiffs can avoid § 1500 jurisdictional issues by filing an appeal in another circuit *after* filing in this court.  *See Brandt v. United States*, 710 F.3d 1369, 1379–80 (Fed Cir. 2013) ("Given the statutory text, we conclude that, once a claim is dismissed or denied, it is no longer 'pending' for § 1500 purposes until a motion for reconsideration or notice of appeal is filed.").  In other words, while a plaintiff would be barred from suing in this court after filing an appeal elsewhere, a plaintiff can maintain two parallel suits without succumbing to § 1500 if they wait to appeal in another circuit until after they file a separate action here.  Indeed, in *Brandt*, § 1500 did not apply when plaintiff filed an appeal one day after filing in this court.  *See id.* at 1372–73, 1380.  The government acknowledged this at oral argument, confirming there would be no § 1500 bar if plaintiff had filed its appeal in the Fourth Circuit after filing its lawsuit in this court.  Tr. at 35:23–36:15 ("THE COURT:  Just by way of example that you just described, you would agree that Leebcor could have properly filed in this Court in the gap in time after the District Court decision but before the notice of appeal?  [GOVERNMENT]:  Under the *Brandt* case,

exactly.  That's what the *Brandt* case held, Your Honor.  THE COURT:  But then filing it after the notice of appeal, when there are two suits pending, that would not be okay? [GOVERNMENT]:  Right.").  This apparent loophole allows for gamesmanship and does little to "curb duplicate lawsuits."  Thus, while the government argues the original meaning of § 1500 is largely irrelevant, the government nonetheless concedes no one in "1868 . . . envisioned this" and "[i]f someone was writing a blank slate, would they write the law to work this way?  I imagine not[.]"  Tr. at 70:17–71:5.  Adding to the absurdity of contemporary § 1500 jurisprudence is the ability of litigants to cure a § 1500 defect by merely dismissing and refiling immediately, resulting in nothing more than the delay in adjudication of an otherwise ripe claim to satisfy a jurisdictional anachronism.  Tr. at 69:13–70:4 ("[THE COURT:]  Just to confirm before we look at the other cases, [government counsel], at the status conference, you confirmed that, in the Government's view, the solution to this problem is for the Plaintiff to simply voluntarily dismiss the case here and then immediately refile the next day?  [GOVERNMENT:] . . . Yes.  THE COURT:  And then that would cure the Section 1500 issue?  [GOVERNMENT]:  Right.  THE COURT:  And the Court could even waive the filing fees.  [GOVERNMENT]:  Right.  I think the Court could do that.  I have seen the Court do that before.")

Additionally, as highlighted by the government at oral argument, if interpreted too broadly, there is a risk § 1500 will be applied in such a sweeping manner as to bar minimally related claims.  Indeed, at oral argument the government urged the Court to adopt such an interpretation of § 1500 and stated § 1500 should apply "[i]f *something* is going on in another Court."  Tr. at 46:19–47:12 (emphasis added).  As discussed in a hypothetical at oral argument, the government's interpretation could go so far as to bar a suit in this court if *any* previously filed suit even touches on the same contract.  Tr. at 47:13–50:4 ("THE COURT:  How about if Leebcor had a claim pending in the District Court related to a car accident on base while performing the contract? . . . [GOVERNMENT]:  So Leebcor files a lawsuit in District Court, I guess? . . . Arguing that the Government is responsible for the harm to its driver?  THE COURT: Yep. . . . Can Leebcor file a suit in this Court for this contract claim? . . . [GOVERNMENT:] So if they both involve the same contract, then maybe it would apply. . . .  It sounds like that would be a close case . . .").  It is for these reasons other judges have referred to today's application of § 1500 as a "[jurisdictional] trap for the unwary," with little remaining connection to its original public meaning.  *Def. Distrib. & Second Amend. Found. v. United States*, No. 23-849, 2024 WL 1092509, at *2 (Fed. Cl. Mar. 13, 2024) (Bruggink, J.).

**VII.   Conclusion**

For the foregoing reasons, the Court **DENIES** the government's Motion to Dismiss, ECF No. 5.  The government **SHALL FILE** its Answer on or before **5 July 2024**.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge
